**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

**DANIEL BANKS**,

           **Petitioner,**

                                 **Civil action no. 5:08cv162**
      vs.                          **Criminal action no.  5:05cr30**
                                 **(Judge Stamp)**

**UNITED STATES OF AMERICA,**

           **Respondent.**

### REPORT AND RECOMMENDATION

## I. Introduction

On October 28, 2008, Petitioner filed a Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody.  Upon a preliminary review of the petition, it appeared that the petition was untimely, having been filed almost four months after the one-year statute of limitations had expired.  Thus, pursuant to <u>Hill v. Braxton</u>, 277 F.3d 701, 707 (4th Cir. 2002), on October 30, 2008,  the undersigned issued a notice advising the petitioner that his case would be recommended for dismissal unless he could show that his motion was timely. (Dkt.# 105).

On November 17, 2008,  petitioner filed his response,[1] asserting  that his § 2255 motion had been timely filed and providing proper verification of the same.

On October 6, 2009, the Government was ordered to respond. (Dkt.# 111).  The Government filed its response on December 7, 2009.[2]  Petitioner filed his Reply to the Government on January

---

[1] Petitioner's response was titled Petitioner's Motion for Equitable Tolling in Response <u>Hill v. Braxton</u> Notice [sic].  Dkt.# 107.

[2] Prior to this, on November 2, 2009, the Government filed a Motion for Extension of Time to File Response (Dkt.# 114) which was granted by Order entered November 5, 2009.  Dkt.# 115.

5, 2010.[3]

## II.  <u>Facts</u>

### A.  <u>Conviction and Sentence</u>

On November 3, 2005, after a three-day trial, petitioner was convicted of one count of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g).  On January 23, 2006, petitioner was sentenced to ninety-two (92) months imprisonment to be followed by two (2) years supervised release.

### B.  <u>Direct Appeal</u>

On February 2, 2006, petitioner filed a Notice of Appeal.  (Dkt.# 85).  On appeal, petitioner contended that: 1) he was "effectively deprived of the indicia of innocence" because he was not permitted to attend the jury view of the crime scene unshackled; 2) the district court erred by admitting .45 caliber pistol into evidence as it was irrelevant and unduly prejudicial; 3) his sentence was unreasonable because the court failed to depart from the guideline based upon petitioner's difficult childhood circumstances; and 4) his sentence was based upon the district judge's personal beliefs about his father rather than evidence adduced at the sentencing hearing.

On January 11, 2007, the judgment of the district court was affirmed by the Fourth Circuit in an unpublished  *per curiam* opinion. (Dkt.# 97).  Mandate issued on February 2, 2007.  (Dkt.# 98).  Petitioner filed a petition for a writ of *certiorari* with the United States Supreme Court, which was denied on June 29, 2007.  (4th Cir. Dkt. # 39) (06-4151).

### C.  <u>Federal Habeas Corpus</u>

---

[3] Previously, on December 14, 2009, petitioner filed a Motion for Extension of Time to File Reply to Government's Response (Dkt.# 121) which was granted by Order entered on December 15, 2009. Dkt.# 123.

**Petitioners' Contentions (Dkt.# 119)**

In his federal habeas petition, the Petitioner raises the following issues:

(1)     denial of due process because

(a)  the prosecution intentionally withheld scientific testing which would have conclusively proved that petitioner did not possess the Smith & Wesson pistol;

(b) the prosecution entered both firearms into evidence, when petitioner was only charged with possessing one of them;

(c) the police subjected petitioner to an overly-suggestive two-person witness identification line-up;

(d) the police intentionally failed to request certain tests that would have exonerated petitioner as having been in possession of the Smith & Wesson pistol, such as: fiber testing on the jackets that were found wrapped around the firearms; DNA testing on the jacket found wrapped around the Smith & Wesson pistol; a primer test to compare the composition of gunshot residue ("GSR") on petitioner's hands versus that in the expended shell casings [found at the scene of the shooting, several blocks away from where the guns were abandoned]; and fingerprint analysis of the Smith & Wesson pistol;

(e) the prosecution varied the jury instruction from its theory of the offense by submitting a "constructive possession" charge instead of an "actual possession" charge;

(f) at sentencing, petitioner was given a two-level upward departure under § 3C1.1 for obstruction, and should not have received an increase in base offense level, pursuant to § 2K2.1(b)(5) [sic], "in violation of <u>Booker</u>-3/ and <u>Crawford</u>-4/;"

(2)     ineffective assistance of counsel at trial for:

(a)     failure to obtain independent expert testing of the clothing, weapons, shell casings and GSR results, to demonstrate that petitioner did not fire a weapon or wear either jacket introduced at trial;

(b)     failure to interview witnesses and visit the crime scene to authenticate the witness statements and the contents of the crime scene within the <u>Brady</u> material from the Government; and

(c)     failure to object to and/or preserve as issues for appeal all the "intrinsic/implicit issues within [petitioner's attached] "Discussion'" (memorandum in support); and

(3)     ineffective assistance of appellate counsel for failing to appeal all of his due process violations.

Petitioner requested an evidentiary hearing to address all of the above issues and requested that the court issue an order directing the Government preserve all evidence for further testing and review. Petitioner also requested that the Government be ordered to obtain independent testing of the jacket(s) for DNA and fibers to "determine the true identity of person or persons culpable for the underlying offense" and perform the primer test to compare the GSR found on petitioner's right hand with that present in the expended shell casings found at the scene of the shooting.

Petitioner further requested that the Court vacate his conviction; order a new trial; appoint counsel on his behalf; and grant any other relief to which he might be entitled.

**Government's Response (Dkt.# 119)**

(1)     Petitioner's due process claims are all procedurally defaulted, either because they were already raised on appeal and resolved, or because they could have been raised on appeal but were not. Further, all of petitioner's due process claims are without merit.

(2)     Petitioner's ineffective assistance of counsel claims are defeated because:

(a)     Petitioner's claim that counsel was ineffective for not requesting other and additional forms of scientific testing are speculative and based on incorrect assumptions. Further, since additional testing might well have corroborated other evidence supporting petitioner's guilt, such a strategy by counsel may well have backfired. In any case, there was powerful circumstantial and eyewitness evidence tending to connect petitioner to the shooting, and counsel did procure an independent GSR expert who testified at trial regarding possible alternative explanations for the finding of GSR particles on petitioner's hand. Petitioner has failed to show that counsel's performance was deficient and has failed to show prejudice, thus he failed his burden under Strickland.

(b)     Petitioner's claim that counsel failed to interview witnesses and to visit the crime scene is insufficiently pled, lacks merit and thus cannot be responded to. Further, counsel did call three [sic] lay witnesses from defendant's

4

neighborhood to testify at trial.

(c)     Trial counsel's performance can not be found deficient for failing to object when there was no basis in the law to do so, or when an objection would be futile, such as petitioner's contention that the prosecution and police are obligated to conduct whatever scientific testing he desired.  The show-up identification was litigated at a motion to suppress hearing and counsel did object to the Magistrate Judge's Report and Recommendations.  Further, counsel did make objections as to the sentencing issues which were litigated at sentencing, and counsel did appeal the issue of the admissibility of the second firearm.     Finally,   petitioner's   "catch-all"   claim   covering "intrinsic/implicit" issues is too vague to provide a substantive response.

## Petitioner's Reply (Dkt.# 126)

In his reply, Petitioner reiterates his claims previously made in his § 2255 motion, and

attempts to refute the Government's position on the same:

(1)     The Government inaccurately states the applicable law as it relates to the due process issues;

(a)     **Supplementing Original Issue 1(a), 1(d) and 2(a)**: the demonstration that DNA collected from a crime scene does not match the conviction is an exception to the Teague[4] rule; the several-blocks-long foot chase alleged in this case would have left "considerable amounts of sweat (on the jackets the guns were found wrapped in) for DNA comparison," such testing would have exonerated petitioner, whose actual innocence is not waived, contrary to the respondent's "bald assertion" otherwise;

(b)     **Supplementing Original Issue 1(a), 1(d) and 2(a)**: Petitioner concedes that law enforcement has "no boilerplate procedure to follow" in performing scientific testing during an investigation, but asserts that law enforcement has an ethical and civil duty to verify criminality to protect the innocent from prosecution for crimes they did not commit.  Petitioner contends that the additional DNA testing requested would have cleared him and instead "implicated others, such as the first person arrested and held, then released when witnesses chose Movant from the rear of the police station."  Further, petitioner asserts that the prosecution's expert witness was qualified to identify the chemical composition of primer and GSR elements; such testing could have verified that the GSR found on petitioner's hand had the "identical composition as that found in the discharged rounds found with the weapons recovered [sic]."[5] The

_____

[4] Presumably petitioner, although he did not cite to it, is referring to Teague v. Lane, 489 U.S. 288 (1989).

[5] Presumably petitioner meant to say "as that found in the discharged rounds at the scene of the shooting" as there were no discharged rounds found with the recovered weapons.

Government "misses the point, in that the composition of the GSR was not tested, but only that the elements found on Movant's hands was [sic]consistent with GSR. Movant contends that the GSR found on his hand, was NOT identical to that of the weapons found and argued as being used that day[,]" and it is possible that the GSR found on petitioner's hand was "second-hand GSR from being transported in the rear of the squad car." Additionally, the fiber testing would have proven that no hair would be found linking petitioner (who has facial hair and long hair) to the jackets found wrapped around the guns and that finding would have discredited the testimony of the witnesses who testified that they saw the shooter wearing either of the jackets. Finally, eyewitness testimony is inherently unreliable, and the "only witnesses had some vested interest in the outcome . . . retribution [against petitioner] for guns discharged in their proximity." Had all this testing been performed, petitioner contends that the outcome of the trial would have been very different.

(c) **Supplementing Original Issue 1(f)**: Regarding the Government's contention that petitioner "lied in an effort to conceal his guilt," the court should order the evidence testing petitioner is requesting, in order to exculpate petitioner, and should require a new trial to prevent manifest injustice. "Even if Movant is convicted [a second time], based upon the eyewitness evidence overcoming the DNA results, this enhancement [for obstruction] would be inappropriate and the levels of reduction associated therewith, would free him from a federal prison." Further, the four-level enhancement for trafficking in firearms that the Government contends was only a typographical error should be thoroughly reviewed by the court to ensure that it did not have an effect on his sentencing.

(2) **Supplementing Original Issue 2(c)**: Regarding petitioner's ineffective assistance of counsel claims for appellate counsel's failure to raise his due process issues on appeal, the Government's argument that these issues are procedurally defaulted because petitioner failed to raise them on appeal is false. Petitioner was "precluded from arguing issues not presented . . . in the trial court, as the Court of Appeals would flatly rule them as unripe."

(a) **Supplementing Original Issue 1(c)**: Respondent's position, that trial counsel did argue the issue of the overly-suggestive line-up at trial, overlooks the fact that "counsel did not compassionately seek its review in the Court of Appeals."

(b) **Supplementing Original Issue 1(e)**: Petitioner concedes that the Government is correct in stating that it has no obligation to disclose "theories of evidence" in the indictment and is only required to give notice of the charges. However, the Government is required to disclose its theory of prosecuting the case and the evidence it intends to introduce, in order to enable a defendant to mount a meaningful defense. Since the indictment did not specify whether the firearm possession was actual versus constructive, the prosecution was only permitted to have petitioner "convicted of possessing the firearms found in the vacant lot, not fired at the victims." If petitioner was "being charged with just the offense of [being a felon in possession of a firearm] . . .then he should have been permitted to sever that Count

from the trial, as the introduction of the prior conviction impermissibly tainted the jury against him in the shooting."

For these reasons, the petitioner argues that Court should grant his habeas corpus petition, set aside his conviction, and order a new trial. In the alternative, the petitioner argues that the court should order the requested scientific testing of the garments.

## III. Analysis

### A. Petitioner's Burden of Proof

A petitioner collaterally attacking his sentence or conviction bears the burden of proving his sentence or conviction was imposed in violation of the Constitution or laws of the United States, that the court was without jurisdiction to impose such a sentence, that the sentence exceeded the maximum authorized by law, or that the sentence otherwise is subject to collateral attack. 28 U.S.C. § 2255. A motion collaterally attacking a petitioner's sentence brought pursuant to § 2255 requires the petitioner to establish his grounds by a preponderance of the evidence." Sutton v. United States of America, 2006 WL 36859 *2 (E.D. Va. Jan. 4, 2006.

### B. Procedurally Barred Claims

Before evaluating the merits of petitioner's claims, the Court must determine which of petitioner's issues he may bring in his § 2255 motion and which are procedurally barred.

It is well settled that non-constitutional issues that could have been raised on direct appeal but were not may not be raised in a collateral attack such as a § 2255 motion. (emphasis added) Sunal v. Large, 332 U.S. 174, 178-79 (1947); Bousley v. United States, 523 U.S. 614 (1998). Constitutional errors that were capable of being raised on direct appeal but were not may be raised in a § 2255 motion so long as the petitioner demonstrates 1) "cause" that excuses his procedural

default, and 2) "actual prejudice" resulting from the alleged error.  (emphasis added)  <u>United States v. Maybeck</u>, 23 F.3d 888, 891 (4th Cir. 1994).

"[A] final judgment commands respect.  For this reason, we have long and consistently affirmed that a collateral challenge may not do service for an appeal."  <u>United States v. Frady</u>, 456 U.S. 152, 165 (1982).  Therefore, the failure to raise a claim on direct appeal may result in a procedural default barring collateral review.  <u>Bousley v. United States</u>, 523 U.S. 614 (1998).

"In order to collaterally attack a conviction or sentence based upon errors that could have been but were not pursued on direct appeal, the movant must show cause and actual prejudice resulting from the errors of which he complains or he must demonstrate that a miscarriage of justice would result from the refusal of the court to entertain the collateral attack."  <u>United States v. Mikalajunas</u>, 186 F.3d 490, 492-493 (4th Cir. 1999).  "The existence of cause for a procedural default must turn on something external to the defense, such as the novelty of the claim or a denial of effective assistance of counsel."  <u>Id.</u>

In establishing "prejudice," the petitioner must show the error worked to his "actual and substantial disadvantage," rather than merely created a possibility of prejudice.  <u>See</u> <u>Satcher v. Pruett</u>, 126 F.3d 561, 572 (4th Cir. 1997) (quoting <u>Murray v. Carrier</u>, 477 U.S. 478, 494 (1986)).  In the alternative to establishing "cause" and "prejudice," the petitioner may demonstrate "actual innocence," or that "it is more likely than not, in light of all the evidence, that no reasonable juror would have convicted him."  <u>Bousley v. United States</u>, 523 U.S. 614, 621 (1998).  "In order to demonstrate that a miscarriage of justice would result from the refusal of the court to entertain the collateral attack, a movant must show actual innocence by clear and convincing evidence."  <u>Mikalajunas</u>,186 F.3d at 493.  "Typically, to establish actual innocence, a petitioner must

demonstrate actual factual innocence of the offense of conviction, i.e., that petitioner did not commit the crime of which he was convicted; this standard is not satisfied by a showing that a petitioner is legally, but not factually, innocent." Id. at 494. The petitioner must show that "it is more likely than not that no reasonable juror would have convicted him." Schlup v. Delo, 513 U.S. 298 (1995). Should a petitioner prove actual innocence, the court should issue a writ of habeas corpus to prevent a "miscarriage of justice," regardless of whether the issue was procedurally defaulted. Hurdle v. United States, 2007 U.S. Dist. LEXIS 37709, at *6-7 (E.D. Va. May 22, 2007) (relying on Schlup v. Delo, 513 U.S. 298 (1995). Finally, issues previously rejected on direct appeal may not be raised in a collateral attack. Boeckenhaupt v. United States, 537 F.2d 1182 (4th Cir. 1976).

Accordingly, the undersigned concludes that petitioner's 1(b) claim that his due process rights were violated when the prosecution entered both firearms into evidence when petitioner was only charged with possession of one of them is procedurally barred, as it was already raised on appeal and rejected. Boeckenhaupt, 537 F.2d at 1182.

The undersigned further concludes that petitioner's claims that his due process rights were violated when: 1(a) the prosecution intentionally withheld scientific testing which would have conclusively proved that he did not possess the Smith & Wesson pistol; 1(c) he was subjected to an overly-suggestive two-person witness identification line-up; 1(d) the police intentionally withheld certain scientific tests that might have exonerated him; 1(e) the prosecution varied its theory of the offense by submitting a "constructive possession" charge jury instruction, rather than an "actual possession" charge instruction; 1(f) at sentencing, he received a two-level upward departure for obstruction and an increase in base offense level pursuant to § 2K2.1(b)(5), "in violation of Booker-3/ and Crawford-4/" are all procedurally defaulted because they could have been, but were not raised

on appeal, unless the petitioner can show cause and prejudice for the default. Id.

In his memorandum in support of his petition, the petitioner impliedly asserts that "cause" exists because trial counsel was ineffective. Petitioner claims that his counsel failed to object and/or preserve as issues for appeal all of the above due process issues. Petitioner further contends that he was prejudiced by counsel's failure to do so, in that the outcome of the trial would have been very different had these issues been addressed.

Accordingly, it is necessary to review each of petitioner's claims to determine if he was prejudiced by counsel's alleged failure to object and whether cause exists for not raising the claims on direct appeal.

**Ground One (a) and (d) - Whether Petitioner's Due Process Rights Were Violated When the Prosecution Intentionally Withheld and the Police Intentionally Failed to Request Certain Scientific Testing Which Would Have Conclusively Proved That Petitioner Did Not Possess the Smith & Wesson Pistol**.

Since these claims are essentially the same, they are combined here for clarity and expediency. Petitioner contends that the Government, through the police, intentionally, rather than negligently failed to request: 1) DNA, GSR and fiber testing on the jackets that were found wrapped around the abandoned firearms; 2) DNA and other (unspecified) testing on the clothes removed from petitioner at the police station; 3) a primer test to compare the composition of GSR on petitioner's hands versus that found in the expended shell casings found at the scene of the shooting; and 4) a fingerprint analysis of the Smith & Wesson pistol. Petitioner claims that the results of these tests would have conclusively proven that he was not the shooter or the one who had worn either of the jackets. He seizes on the testimony of the ATF agent who took custody of petitioner's clothing and placed them into evidence, contending that the sweat in the clothing "would . . . [have been] fertile grounds in which to cultivate DNA and other samples." Petitioner further asserts that "the officers,

agents and federal prosecutors, refused to request such tests *or concealed results of these tests* . . . [and]  the denial of exculpatory evidence is within the distinct parameters of <u>Brady</u>.[6]  (emphasis added).   Petitioner further claims, in his reply to the Government's response, that; the several-blocks-long foot chase alleged in this case would have left "considerable amounts of sweat (on the jackets the guns were found wrapped in) for DNA comparison," and that such testing would have exonerated him.

First, it should be noted that the record reveals that fingerprint analysis *was* performed on the handguns. (Dkt. # 92-2 at 334).  No fingerprints were found, and at trial, the Government's  expert testified  at length regarding the results of that testing.  (<u>Id</u>. at 335 - 343).

Petitioner's premise is faulty and self-serving.  Simply because a given test is performed does not necessarily mean it will exonerate him; the testing he seeks might as easily have corroborated the already-substantial evidence implicating him as the shooter who later abandoned the gun.  Further, even a negative test result does not automatically  vindicate.  The lack of fingerprints on the Smith & Wesson could easily be a result of it having been deliberately "wiped down" before it was abandoned;  identifiable prints being inadvertently obliterated by law enforcement when the gun was first secured and handled;  or because oils and lubricants normally present on the gun, or the  rough surface of its own parts prevented prints from being left at all.  (<u>Id</u>. at 335 - 337).[7]

Second,   petitioner cites no authority to support his claim that the prosecutor or law enforcement commits misconduct by failing to conduct scientific testing that a particular defendant wants performed.   To the contrary;  the Due Process Clause is *not* violated when the police fail to

---

[6] <u>Brady  v. Maryland</u>, 373 U.S. 83 (1963).

[7] The Government's forensic fingerprint expert, an ATF agent, testified that about 70% of the time identifiable fingerprints are *not found* on firearms submitted for examination.  Dkt.# 92-2 at 337.

use a particular investigatory tool. "If the court meant . . . that the Due Process Clause is violated when the police fail to use a particular investigatory tool, we strongly disagree.... the police do not have a constitutional duty to perform any particular tests." Arizona v. Youngblood, 488 U.S. 51, 58 - 59, 109 S. Ct. 333; 102 L. Ed. 2d 281 (1988). Further, petitioner fails to identify exactly what tests he is alleging that the prosecution performed, obtaining exculpatory results that it then deliberately concealed from him.

Finally, the Government has no obligation under Brady to turn over evidence which does not actually *exist* but might be produced as a result of as-yet-unperformed testing. Further, petitioner's assertion that the evidence that might have been produced as a result of this testing would have conclusively exonerated him from having been the one who fired the weapon and later discarded it, wrapped in the jackets, is unsubstantiated and purely speculative.

The record reveals that the shooting occurred at in an alleyway between Fourteenth and Fifteenth Streets. (Dkt.# 77-1 at 35 - 40). A Government witness testified that he knew petitioner well and recognized him as the man who shot at him that day. (Dkt.# 77-1 at 38-39). Another witness, who lived in a second-floor apartment at 80 Fourteenth Street (Id. at 5), at the corner of the alley where the shooting occurred, testified that when she heard the shots, she looked out of a window facing onto the alley to see two black males running north, away from her apartment, up Byron Street toward Thirteenth Street. (Id. at 5 - 8). The clothing she described the two men wearing fit the description of what petitioner and the other defendant were wearing when apprehended. (Id. at 7 - 8 and Dkt.# 91-2 at 171 - 176). She further testified that one man was

wearing a dark colored jacket; the other was carrying one.[8] (Dkt.# 77-1 at 6 - 10). The next witness testified that he was standing in the alley waiting, heard shots fired, called 911 and while still on the phone with the 911 operator, saw a man later identified as petitioner running up the alley between Thirteenth and Fourteenth Streets, near the Scottish Rite Cathedral at the corner of Fourteenth and Byron Streets (Dkt.# 77-1 at 15 - 17), wrapping a gun in a dark-colored jacket or sweatshirt as he went. (Id. at 17 and 18). The officer who apprehended petitioner and the other defendant, minutes later and only a couple blocks or about "400 - 800 yards as the crow flies" from where the shooting occurred (Dkt.# 51 at 18 and 25) testified that although the two were walking along Twelfth Street, when apprehended (Id. at 25), they appeared to be "sweating enough where [they] just ran"on a day that "was not extremely hot."[9] (Dkt.# 91-2 at 174). The officer testified that petitioner and his co-defendant were "fidgeting" and acting like "they were nervous kind of." (Dkt.# 51 at 27 - 28).

The incident occurred on a Saturday in mid-to-late spring;[10] although sunny when petitioner was apprehended (Dkt.# 91-3 at 181), the officer who, minutes after the shots were heard, discovered the discarded guns wrapped in the jackets on the ground near Central Catholic High School's gym, testified that despite a heavy rain in the area within the hour, the jackets were dry to the touch when found, indicating they had not been there long. (Dkt.# 91-2 at 156).

Finally, the Government's ballistics expert confirmed that the gun that was fired at the scene

---

[8] Petitioner was later identified as the one who was carrying, rather than wearing a jacket. (Dkt.# 77-1 at 17).

[9] Officer Kotson's testimony at a September 12, 2005 motion hearing was that "I didn't think about it but my partner brought it to my attention that [Banks and Pugh] were sweating heavily." (Dkt.# 51 at 27.) On cross-examination, Officer Kotson testified that his partner "just brought [the sweating] to my attention." He said, "Don't you think they are sweating like – when not at that time but like when we first found them. He's like don't you think they were sweating quite a bit just to be walking up the hill. And I didn't even think about it until he said it and I agreed that they were sweating, like dripping quite a bit." (Id. at 28-29).

[10] The incident occurred on May 28, 2005.

of the shooting was the same gun (Dkt.# 92-2 at 352) that was found, minutes later, along with a second gun, wrapped in two dark-colored jackets matching the description of those that petitioner and his cohort had been seen wearing or carrying, left in a shallow area in the ground behind the Central Catholic High School gymnasium (Dkt.# 91-2 at 146 - 152). The police tested petitioner and the two other men he was with that day for gunshot residue; of the three, only petitioner's hands tested positive for gunshot residue. (Dkt.# 92-1 at 284- 286).

Petitioner, his co-defendant Pugh, and Lorenzo Clark, the other man eventually placed in the witness identification lineup with them, had all worn jackets.[11] Unlike the sweat-soaked shirt and pants petitioner was apprehended in, the jacket which petitioner was seen *carrying,* not wearing as he ran, was found only moments later, wrapped around the guns, was dry to the touch. There is no credible evidence to suggest it was soaked in sweat. The sweat-soaked shirt and pants petitioner was wearing when apprehended were removed from him at the police station, absolving any issue of whether he wore them. Accordingly, performing DNA testing of the same would have served no purpose. Based on the totality of the evidence available to the prosecution, the Government had no duty to perform any particular further testing.

Petitioner's claims of prosecutorial misconduct have no support in the record. Absent such support, no due process violation on that grounds exists and the claim should be denied. Furthermore, the undersigned finds the claims encompassed in Ground One (a) and (d) are without merit; could have been raised on direct appeal; were not so raised; no cause exists for not raising

---

[11] At the witness identification line-up, petitioner's cohort Pugh was brought out first. (Dkt.# 51 at 51). Next was Lorenzo Clark, one of the men who had been shot at. (Id. at 52). When Clark was brought out, the eyewitness Stewart, said "[t]hey brought out another gentleman and I looked at him and I said, "It could be," but when you know he had a jacket on and I said have him - - I think I said, "Take the jacket off." And it wasn't." Dkt.# 51 at 66.

them other than the fact that they lack merit and would be frivolous, and therefore they are now procedurally barred.

**Ground One (c) - Whether Petitioner's Due Process Rights Were Violated When the Police Subjected him to an Overly-Suggestive Two-Person Witness Identification Line-Up**.

Petitioner contends that his due process rights were violated when he was subjected to an overly-suggestive, "sham" two-person line-up when he was brought out in handcuffs as though already arrested, to be identified by an "alleged" witness who "admitted that his attention was focussed [sic] on the gun, not the man carrying it." (Dkt.# 103 at 9).

Determination of whether an initial pre-trial identification procedure is improper, thus tainting the later in-court identification of a defendant by a witness whose original identification of the defendant is then suspect, is governed by the 'independent origins' test. United States v. Wade, 388 U.S. 218, 241, 87 S. Ct. 1926; 18 L. Ed. 2d 1149(1967). Application of the test requires consideration of certain factors: 1) the witness' prior opportunity to observe the alleged criminal act; 2) the existence of any discrepancy between any pre-lineup description and the defendant's actual description; 3) any identification prior to lineup of another person; 4) the identification by picture of Defendant prior to lineup; 5) failure to identify Defendant on a prior occasion, and 6) the lapse of time between the alleged act and the lineup identification. Id. at 241. A two-step inquiry is required: 1) Was the initial identification impermissibly suggestive? And 2) even if so, is the in-court identification reliable? United States v. Johnson, 114 F. 3d 435, 441 (4th Cir. 1997), *cert. denied,* 552 U.S. 903(1997). Factors used to assess in-court identification testimony reliability are: 1) the opportunity of the witness to see the perpetrator at time of the crime; 2) the witness' degree of attention: 3) the accuracy of the witness' prior description of the perpetrator; 4) the witness' level of certainty when identifying a defendant as the perpetrator at the time of confrontation; and 5) the

length of time between the crime and the confrontation. Id. at 441.

A defendant challenging an allegedly improper pre-trial identification procedure must first show that the identification was impermissibly suggestive. Marson v. Brothwaite, 432 U.S. 98 (1977). Then the court must determine whether the identification was reliable under the totality of the circumstances. Id. 114 - 117. The factors to be considered are: 1) the opportunity of witness to view the criminal at time of the crime; 2) the witness' degree of attention: 3) the accuracy of the witness' description of the criminal; 4) the level of certainty by witness at confrontation; and 5) the length of time between the crime and the confrontation. Neil v. Biggers, 409 U.S. 188 (1972) (allowing in-court identification after a pre-trial "SHOW UP".) Finally, the defendant bears the burden of proving that pre-trial identification procedures were impermissibly suggestive.

Here, the witness Stewart had an excellent opportunity to observe petitioner at the time of the incident. Although it had rained an hour earlier (Dkt.# 91-3 at 181), it was a "bright, nice sunshiny day" (Dkt.# 77-1 at 23) when Stewart first observed petitioner as he ran toward him in the alley near where the shooting had occurred. (Dkt.# 77-1 at 17). Stewart was already alert to what was happening around him, because he was in the vicinity, standing in the alleyway, had just heard gunshots and still was on his cell phone reporting it to 911 when he observed petitioner come running toward him. (Dkt.# 77-1 at 17). There was no difference between Stewart's description of petitioner to the 911 operator or to Detective Ty Miller, who conducted the line-up, and petitioner's actual appearance at the witness line-up behind the police station. (Dkt.# 77-1 at 17 and 20 - 21, and 27, Dkt.# 91-2 at 124 and 127). Stewart did not identify any other person; he was absolutely certain that it was petitioner who was the person he saw running in the alleyway,[12] and not either of the other

---

[12] Stewart testified that he was "100 percent" certain that petitioner was the man he saw running in the alley, wrapping the gun in a jacket. Dkt.# 77-1 at 23.

two persons in the line-up.[13]  (Dkt.# 91-2 at 128).  There was nothing shown to Stewart prior to the "live" witness identification line-up.  Stewart immediately and positively identified petitioner as soon as he saw him, at the only witness identification line-up that was ever conducted.  The officer who conducted the line-up testified at trial that petitioner was apprehended within 5-7 minutes of the initial "shots fired" call.  (Id. at 123).  He further testified that he took a written statement from Stewart shortly after being advised that the suspects had been apprehended.  (Id. at 123- 124).  The time span between Stewart's initial statement to the police and the line-up was approximately twenty minutes.  (Id. at 126).  Thus, the total elapsed time between when Stewart saw the man in the alley and when the line-up was conducted behind the police station could have been no more than thirty minutes.  (Dkt.# 77-1 at 21 - 22 and Dkt.# 91-2 at 123 - 124 and 126).  Therefore, under the Wade test, none of the six factors suggests an impermissibly suggestive witness identification.

Even if one concludes the identification procedures were impermissibly suggestive, which the undersigned does not, the identification was reliable.  First, witness Stewart had an unobstructed view of petitioner as he  ran up the alley toward Stewart, wrapping the gun in what looked like a black sweatshirt. It was day time - - a clear, sunny day. Stewart was focused on the petitioner, because he was concerned enough after hearing the shots to call 911, and was actually still on the phone with the 911 operator when Stewart came running toward him, wrapping the gun as he ran. Stewart's description of the perpetrator to the 911 operator and the detective who later interviewed him was detailed and specific.  Stewart was certain at the line-up  that petitioner was the man he had seen  running up the alley, wrapping the gun in a black sweatshirt or jacket.  Only a short time had

---

[13] Stewart himself testified on direct exam "They brought the next gentleman out, and I said, 'That is him.' That is the gentleman that the clothing matches and I said 'That's him.'  And I recognized his facial features. He was a nice looking guy and it was easy for me to remember what he looked like. . . . As soon as they brought him out, I recognized the clothes . . . they squared him off, and I knew that was him. (Dkt.# 77-1 at 23).

passed, perhaps as few as thirty minutes, between when Stewart saw first petitioner running up the alley wrapping up the gun, and when the line-up was conducted.

Petitioner has failed to show that the initial witness identification line-up conducted by the police was impermissibly suggestive.[14] Since the line-up was fair, reliable and not overly-suggestive, petitioner's due process rights were not violated. Accordingly, no prejudice exists. This claim lacks merit, is procedurally barred and should be dismissed.

**<u>Ground One (e)</u> - Whether Petitioner's Due Process Rights Were Violated When the**

---

[14] Factors tending toward impermissibly suggestive line-ups are: all the suspects in a line-up with the exception of a defendant being known to the witness; other suspects in line-up being grossly dissimilar in appearance to the suspect; only the suspect being required to wear distinctive clothing which the culprit allegedly wore; the witness being told by the police that the culprit is caught, after which the defendant is brought before the witness alone or viewed in jail; the suspect is pointed out before or during a line-up; and the participants in the line-up are all asked to try on an article of clothing that only fits the suspect. <u>Wade</u>, <i>supra</i>, at 233. Here, the detective conducting the line-up took great care to avoid creating an impermissibly suggestive procedure. Despite petitioner's § 2255 motion claim that a two-person line-up was conducted, the line-up was actually a three-person line-up. (Dkt.# 77-1 at 23 and Dkt.# 91-2 at 125 - 128). It was conducted in a parking lot behind the police station approximately 20 minutes after the officer took Stewart's written statement (shortly after the "shots fired" call came in) describing the man he saw, and only several minutes after Stewart had observed petitioner running in the alleyway with the gun. (Dkt.# 77-1 at 21 - 22 and Dkt.# 91-2 at 126). Stewart, shortly after giving his statement describing the man he saw running with the gun, agreed when asked to view potential suspects in a line-up. (Dkt.# 77-1 at 22). He was immediately driven to the police station by the detective, and sat in the squad car with the officer to view the potential suspects. (<u>Id</u>. at 22 - 23). The detective prefaced the line-up by carefully instructing Stewart that although three potential suspects had been detained, just because the three were there did not make any of them guilty of being involved in the offense. He further cautioned Stewart that he did not have to pick any one of them. (Dkt.# 91-2 at 125). The officer testified that "I did not want Mr. Stewart to feel at any time that he had to pick somebody out just because we had somebody detained at all. I wanted to make sure in my mind that Mr. Stewart picked the person that he saw running." (<u>Id</u>. at 129). Stewart testified "[t]hey told me that they had a suspect and they wanted to do a lineup. And the police officer would not discuss the matter with me anymore. I told him I had never done anything [like this before], what was I supposed to do? He said 'I cannot discuss that with you. We are not going to try to and [sic] convict an innocent person here.'" ( Dkt.# 77-1 at 26). The officer then communicated by radio to the officers inside the station, and then each of the three potential suspects were led out, one at a time. None of the others were visible before or while any one of the others was being shown. Each of the three potential suspects presented for Stewart's viewing were young black males who were substantially similar in appearance, age, build and skin color. (Dkt.# 91-2 at 126 - 27). Two of the three (one of them was petitioner) were wearing white T-shirts. (<u>Id</u>. at 127). Each was presented separately for viewing at a distance of about 15 - 25 feet from Stewart, led out of the station, handcuffed behind their backs and guided with one hand by a female police officer who held their arm. (Dkt.# 77-1 at 23 and 25 - 26). Petitioner was the last of the three to be led out, and Stewart immediately, positively and without hesitation identified him the moment he came through the doorway. (<u>Id</u>. at 23). Once Stewart had already made the identification, to further ensure that the he had correctly identified the right person, the detective asked him if the subject was in about the same position, relative to him, that he had been when Stewart first saw him. Based on Stewart's response, the officer then had petitioner walk ten feet closer to the squad car, to ensure that Stewart could get a better view. Stewart again identified petitioner without any hesitation. (Dkt.# 91-2 at 125 - 130).

**ProsecutionVaried From its Theory of the Offense in the Indictment by Submitting a "Constructive Possession" Instead of an "Actual Possession"Instruction to the Jury**

Petitioner contends that the Government submitted the elements of "physical" possession of a firearm to obtain the indictment, but that at trial during the charging conference, it submitted the theory of constructive possession to the jury, a "maneuver [that] not only ambushed Petitioner and his defense . . . it posited an additional theory that . . . [petitioner] may have had dominion or control over some unknown defendant in the shooting." (Dkt.# 103 at 10). In his reply to the USA's response, petitioner reiterates his claim that the Government must disclose "its theory of prosecuting the case and the evidence it intends to introduce, so as to provide the defendants [sic] an ability to prepare a meaningful defense." (Dkt.# 126 at 5). He asserts that the Government should only have been permitted to convict him of possessing the firearms found in the vacant lot, not of possessing the firearm that was fired at the victims, because if he was "being charged with just the offense of violating 18 U.S.C. Sec. 922(g), then he should have been permitted to sever that count from the trial, as the introduction of the prior conviction impermissibly tainted the jury against him in the shooting." (Id.).

Petitioner was charged with being a prohibited person in possession of a firearm. The indictment is silent with regard to any particular type of possession. Petitioner was merely charged with "knowingly posess[ing]" the firearm, a Smith & Wesson 9 mm. caliber pistol and nine rounds of ammunition, "in and affecting interstate commerce," after having "been convicted in a court of a crime punishable by imprisonment for a term exceeding one year . . . the felony offense of Distribution of Crack Cocaine[.]." (Dkt.# 1 at 1).

In general, an indictment must only be "a plain, concise, and definite written statement of the essential facts constituting the offense charged. . . A count may allege that the means by which the

defendant committed the offense are unknown or that the defendant committed it by one or more specified means . . ." Fed. R. Crim. Pro. 7(c)(1). The Government has no duty to specify in an indictment what its theory of possession will be. The facts of any given case, as here, often support more than one theory of legal possession. The Court appropriately instructed the jury, and the jury was only required to find that petitioner was knowingly in possession of a firearm. There was eyewitness testimony identifying Banks as the shooter, with actual possession of the weapon while firing it. (Dkt.# 77-1 at 38 - 39). There was testimony describing two young black males, dressed like petitioner and the other defendant, running away from the area where the shooting occurred, immediately after the shots were heard, one wearing and one carrying a dark jacket. (Id. at 6 - 10). There was testimony that Banks was seen near where the shots were heard, running up an alley wrapping a gun in a dark jacket or sweatshirt, just moments after the shots were fired. (Id. at 17). There was direct and circumstantial evidence regarding the two guns found wrapped in two dark jackets, hidden in a shallow hole in the ground only a few feet away from where petitioner was apprehended. (Dkt.# 91-2 at 146 - 148). There was evidence given that the jackets and guns were still dry despite a heavy rain in the area within the hour. (Id. at 156).

The indictment's failure to spell out with exactitude whether petitioner's possession of the weapon was actual or constructive did not preclude petitioner from mounting a meaningful defense. At trial, the Government was required to prove four essential elements: 1) that petitioner had previously been convicted of a crime punishable by a term of imprisonment exceeding one year; 2) that petitioner had not had a restoration of his civil right to possess a firearm; 3) that petitioner knowingly possessed the firearm; and 4) the firearm had previously been shipped or transported in interstate commerce. Both the USA and defense counsel submitted proposed jury instructions

outlining the elements of the crime to be proven at trial. (Dkt.# 47 and Dkt.# 54). Both the USA and defense counsel filed proposed jury instructions defining "possession." (Dkt.# 47 at 3 and Dkt.# 54 at 7). Defense counsel's proposed jury instructions were filed on October 20, 2005 and the Government's were filed on October 25, 2005. The three-day jury trial began on November 1, 2005. Defense counsel was not "unfairly surprised" by the "constructive possession" charge. Indeed, defense counsel participated, as all counsel do, in the finalizing of those jury instructions, including the "actual vs. constructive" possession, before testimony began on the third day of trial. (Dkt.# 93-1 at 432). Furthermore, defense counsel declined the opportunity to object to the jury charge after the Court instructed the jury before it began deliberations. (Dkt.# 93-3 at 505).

Petitioner's claim that if he were "being charged with just the offense of violating 18 U.S.C. Sec. 922(g), then he should have been permitted to sever that count from the trial, as the introduction of the prior conviction impermissibly tainted the jury against him in the shooting" is unclear. Petitioner was only charged with one count; there was no "other" count to sever. To the extent that petitioner is arguing that the jury should not have been advised that he had a prior felony conviction, that fact was one of the four essential elements of the charged offense "felon in possession of a firearm." Therefore, the jury's awareness of that fact was unavoidable. Furthermore, petitioner himself stipulated to the fact of his prior felony conviction (Dkt.# 93-3 at 491) before trial. Finally, by taking the stand in his own defense, defendant opened himself to cross-examination about the details of his prior convictions. Accordingly, there is no prejudice; this claim lacks merit and should be denied as procedurally barred.

**Ground One (f)** - **Whether Petitioner's Due Process Rights Were Violated When at Sentencing, Petitioner Received a Two-Level Upward Departure Under § 3C1.1 for Obstruction, and an Increase in Base Offense Level, Pursuant to § 2K2.1(b)(5) [sic], "in Violation of Booker-3/ and Crawford-4/."**

Petitioner claims that the Court impermissibly enhanced his sentence with a two-level upward departure for obstruction when the Court decided that his trial testimony denying the offense was perjury. Petitioner contends that the Court failed to specifically identify excerpts from the record proving perjury.

First, despite petitioner's attempt to elevate this claim to the level of a due process violation, it is merely a claim that the Court erred in applying sentencing guidelines. Generally speaking, claims of error regarding application of sentencing guidelines cannot be raised in a habeas corpus petition. U.S. v. Pregent, 190 F.3d 279, 283 - 84 (4th Cir. 1999); U.S. v. Mikalajunas, 186 F.3d 490, 495 - 96 (4th Cir. 1999). Claims that a District Court misapplied the sentencing guidelines generally are not cognizable in a § 2255 proceeding because such claims typically do not involve a miscarriage of justice. United States v. Addonizio, 442 U.S. 178, 185 (1979). Non-constitutional claims that could have been raised on direct appeal but were not, may not be raised in a collateral proceeding under § 2255. Davis v. U.S., 417 U.S. 333, 346, 94 S. Ct. 2298, 2305, 41 L. Ed. 2d 109, 119 (1974). Petitioner's § 2255 claims regarding this issue were available to him at the time of sentencing and thus could have been the subject of a timely direct appeal.

When a defendant fails to raise an objection to a constitutional error at trial and on direct appeal, that objection is waived for § 2255 purposes unless the defendant can show 'cause' to excuse his double procedural default and 'actual prejudice' resulting from the errors of which he claims. It is petitioner's burden to prove that errors at sentencing worked to his actual and substantial disadvantage.

Petitioner's claim that his sentence was impermissibly enhanced by two levels for obstruction, based on his perjury at trial ignores the well-established law that holds otherwise: "a

defendant's right to testify does not include a right to commit perjury." United States v. Dunnigan, 507 U.S. 87, 96, 113 S. Ct. 1111, 122 L. Ed. 2d 445 (1993). The two-level sentencing enhancement for obstruction that petitioner received was entirely consistent with the mandate of U.S. Sentencing Guideline §3C1.1, Obstructing or Impeding the Administration of Justice:

> If (A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (B) the obstructive conduct related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense, increase the offense level by 2 levels.

U.S.S.G. §3C1.1.

At sentencing, defense counsel objected to this enhancement, and the Court overruled petitioner's objection, stating that

> . . . I don't come to this conclusion lightly. I tried to refresh my memory by my trial notes and also examined the record that was made from my memory at the trial. I think that, unfortunately, the defendant's version, which he had a right to give by taking the stand and testifying under oath, was at odds with testimony of various witnesses that placed him at places that were diametrically opposed to where he said he was and the route he took. And so I have to find and I do so without - - with appreciation for the fact that one has to look hard when one looks at the defendant's right to testify. I think that the defendant did testify, first, did testify falsely. He testified as to a material fact. And that he also testified falsely as to a material fact willfully in order to obstruct justice and not merely inaccurately as a result of confusion or faulty memory, as that test has been set forth by United States versus Dunnigan in 507 U.S. 87, 1993 case which dealt with this subject.

Sentencing Transcript, Dkt.# 94-1 at 5 - 6.

Contrary to petitioner's assertions, the District Court was not required to specifically identify excerpts from the record to demonstrate each instance of his perjury. In such a circumstance, although

> it is preferable for a district court to address each element of the alleged perjury in a separate and clear finding [] . . . it is sufficient, however, if . . . the court makes a finding of an obstruction of, or impediment to, justice that encompasses all of the

23

factual predicates for a finding of perjury. . . ("The court finds that *the defendant was untruthful at trial with respect to material matters* in this case. By virtue of her failure to give truthful testimony on material matters *that were designed to substantially affect the outcome of the case*, the court concludes that the false testimony at trial warrants an upward adjustment by two levels" (emphasis added)). Given the numerous witnesses who contradicted respondent regarding so many facts on which she could not have been mistaken, there is ample support for the District Court's finding.

Dunnigan *supra* at 95 - 96.

Here, consistent with Dunnigan, the sentencing Court made a specific finding that petitioner willfully testified falsely to a material fact in an attempt to obstruct justice. The Court found that petitioner's testimony was "at odds with testimony of various witnesses that placed him at places that were diametrically opposed to where he said he was and the route he took." (Dkt.# 94-1 at 5 - 6). This claim lacks merit and should be denied.

Petitioner's next claim, that his sentence was impermissibly enhanced when he received a two-level [sic] increase[15] in base offense level pursuant to § 2K2.1(b)(5) [sic], in violation of Booker and Crawford, because § 2K2.1(b)(5) states "[i]f the defendant engaged in the trafficking of firearms, increase by 4 levels." (Dkt.# 103 at 11). Petitioner asserts that he "was never charged with trafficking in any firearms[.]" (Id.). He further contends that in the alternative, "the misguided argument that the 'wanton endangerment' from some uncharged offense can motor [sic] such an enhancement, must fail[.]" (Id.).

Petitioner's argument that he received an impermissible "two-level" [sic] enhancement for "trafficking in firearms" under § 2K2.1(b)(5) misstates the facts and is without merit. Apparently there was a repeated typographical error made by the probation officer in petitioner's PreSentence

---

[15] Petitioner actually received a four-level enhancement, not a two-level enhancement at sentencing; the enhancement was pursuant to § 2K2.1(b)(6), not § 2K2.1(b)(5). (Dkt.# 94-1 at 15).

Investigation Report[16] ("PSR"), which the sentencing Court inadvertently also repeated, regarding

which sentencing guideline subsection a potential wanton endangerment enhancement fell under:

THE COURT: The next objection [to the PSR by the defendant] is to the enhancement of four levels under Guideline 2K2.1b(5) for possession of a firearm in connection with another felony offense, namely wanton endangerment.

Dkt.# 94-1 at 6.

As is indicated by petitioner's alternative § 2255 motion claim regarding "the misguided

argument that the 'wanton endangerment' from some uncharged offense can motor [sic] such an

enhancement," petitioner is well aware that the considered enhancement was applicable pursuant

to § 2K2.1(b)(6), for possession of a firearm in connection with another felony offense (the then-

pending state charge for wanton endangerment), not for "trafficking in firearms." Defense counsel

entered petitioner's PSR objection to the four-level enhancement for wanton endangerment, and

petitioner was present in court while counsel argued it. Even though "§ 2K2.1(b)(5)" was mentioned,

the actual U.S.S.G. subsection enhancement issue that was objected to by counsel and litigated at

the sentencing hearing was the applicability of § 2K2.1(b)**(6),** quoted here in pertinent part:

> If the defendant used or possessed any firearm or ammunition in connection with another felony offense; or possessed or transferred any firearm or ammunition with knowledge, intent, or reason to believe that it would be used or possessed in connection with another felony offense, increase by 4 levels[.]

U.S.S.G. 2K2.1(b)(6).

Although the Court erroneously referenced the wrong sentencing guideline subsection,

---

[16] The error referencing the wrong subsection of the sentencing guideline enhancement was repeated in three places within the PreSentence Investigation Report. However, the probation officer correctly stated what the actually applicable subsection addressed, i.e., the enhancement for wanton endangerment. No mention was made of any enhancement for 'trafficking in firearms.' Dkt.# 82 at 8, 10, and 31. The same typographical error was also repeated in the addendum containing the objections to the PreSentence Investigation Report, attached to the Statement of Reasons. Again, the wrong subsection title (§ 2K2.1(b)(5)) was referenced, but the correct subsection (§ 2K2.1(b)(6)) was actually quoted. Dkt.# 84 at 5.

petitioner was not prejudiced by this error. Defense counsel vigorously argued[17] against the correct four-level enhancement, U.S.S.G. 2K2.1(b)**(6)**, not U.S.S.G. 2K2.1(b)**(5)**, discounting the GSR forensic evidence as not "very compelling," impugning the eyewitness testimony as unreliable, and asking the court to rule that the evidence was not sufficient to support a wanton endangerment enhancement. The Government argued for the enhancement, and defense counsel rebutted. Despite all of that, the Court overruled petitioner's objection, stating that, assuming *arguendo,* as defense counsel claimed, that one of the Government's witnesses had been less than credible, there were still two other reliable witnesses who placed petitioner with the gun at the scene of the shooting. There was never any mention of a sentencing enhancement for 'trafficking in firearms.' This claim lacks merit and should be denied.

Finally, petitioner's reliance on Booker[18] and/or Crawford[19] is misplaced. Crawford has nothing to do with sentencing enhancements, and it is unclear why petitioner cites it.

The undersigned construes petitioner's attack on the reasonableness of his sentence as a claim that his sentence failed to comply with 18 U.S.C. § 3553.[20] In Booker, 543 U.S. at 220, the Supreme

---

[17] Counsel's arguments in objection to the four-level enhancement for use of a firearm in connection with another felony offense spanned seven pages of the sentencing hearing transcript. Dkt.# 94-1 at 6 - 11 and 12 - 14.

[18] U.S. v. Booker, 543 U.S. 220 (2005) (holding that the mandatory sentencing guidelines scheme that provided for sentence enhancements based on facts found by the court, not the jury, and not admitted by the defendant, were unconstitutional as a violation of the Sixth Amendment. The Court remedied the constitutional violation by severing and excising the statutory provision that made the guidelines mandatory, thus rendering them advisory).

[19] Crawford v. Washington, 541 U.S. 36; 124 S. Ct. 1354; 158 L. Ed. 2d 177 (2004) (holding that testimonial statements of witnesses absent from trial are only admissible where the declarant is unavailable, and only when the defendant has had a prior opportunity to cross-examine; other wise they are hearsay statement that violate the Confrontation Clause).

[20] 18 U.S.C. § 3553(a) provides, in part, "Factors to be considered in imposing a sentence. The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider:
    1) the nature and circumstances of the offense and the history and characteristics of the defendant;
    2) the need for the sentence imposed-

Court excised the provisions of the Sentencing Reform Act that  mandated sentencing in conformance with the guidelines and rendered the Guidelines merely advisory.  District courts, however, were not given unbridled discretion in sentencing.  Rather, they were instructed they must still "consult those Guidelines and take them into account when sentencing."  Id. at 767.  District courts - post-Booker - must also adhere to the commands of 18 U.S.C. § 3553.  See United States v. Green, 436 F.3d 449, 455 (4th Cir. 2006).

Sentences imposed by district courts under the above standards are reviewed for unreasonableness.  Booker, at 543 U.S. at 261.  In determining whether a given sentence is appropriate, the court "may not presume that the Guidelines range is reasonable." Gall v. U.S., 552 U.S. 38, 128 S. Ct. 586, 594, 169 L. Ed. 2d 445 (2007).   The Guidelines are to be treated as the "starting point and initial benchmark."  Kimbrough v. U.S., 552 U.S. 85, 109, 128 S. Ct. 558, 169 L. Ed. 2d  481 (2007), quoting Gall at 49.   The district court must make an individualized assessment, based upon the facts presented, and determine whether a sentence outside of the Guidelines is warranted.  Gall at 597.  While 18 U.S.C. § 3553(a) still requires a court to give respectful consideration to the Guidelines, Booker "permits the court to tailor the sentence in light of other statutory concerns as well."  Kimbrough at 101, quoting Booker at 245 - 246.   Since a

---

A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
B) to afford adequate deterrence to criminal conduct;
C) to protect the public from further crimes of the defendant; and
D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
3) the kind of sentences available;
4) the kinds of sentence and the sentencing range established [by the Sentencing Guidelines];
5) any pertinent policy statement [issued by the Sentencing Commission];
6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
7) the need to provide restitution to any victims of the offense."

sentencing judge has greater familiarity with a given case and an individual defendant than the Sentencing Commission, he is in a superior position to find facts and judge their import under § 3553(a) in a particular case. <u>Kimbrough</u> at 109, quoting <u>Gall</u> at 51 (internal quotation marks omitted). The Court is not required to "robotically tick through every factor" enumerated in Title 18 U.S.C. 3553(a) before imposing a sentence. <u>United States v. Eura</u>, 440 F.3d 625, 631- 632 (4th Cir. 2006), as many of those statutory factors are already "built into the Sentencing Guidelines." <u>United States v. Johnson</u>, 445 F.3d 339, 343, 345 (4th Cir. 2006). So long as a sentence is "selected pursuant to a reasoned process in accordance with the law, in which the court did not give excessive weight to any relevant factor, and which effected a fair and just result in light of the relevant facts and law," the sentence will be deemed reasonable. <u>Green</u> *supra* at 457. A petitioner may rebut the presumption of reasonableness only by demonstrating his sentence is unreasonable "when measured against the § 3553(a) factors." <u>United States v. Mykytiuk</u>, 415 F.3d 606, 608 (7th Cir. 2005); <u>see, also, Moreland</u>, 437 F.3d at 433.

In the present case, even with the two level enhancement for obstruction and the four-level increase in base offense level for possession of a firearm in connection with another felony offense, petitioner's sentence was still within the properly calculated Guideline range of 92 - 115 months and is therefore presumed reasonable. <u>See Johnson</u>, 445 F.3d at 339. Further, the Court considered the mitigating factors listed in § 3553(a), when it reviewed petitioner's sentencing memorandum prior to the sentencing hearing, and then again, after hearing counsels' arguments for and against the sentencing enhancements at the sentencing hearing. The sentencing Court had petitioner's PSR available to it, fully describing petitioner's situation: the Court was well aware of petitioner's difficult childhood and straitened financial circumstances, his lack of role models growing up, as

well as his prior criminal offenses. Indeed, the Court specifically commented on numerous details of petitioner's early difficulties. (Dkt.# 94-1 at 26 -28). Likewise, at the time of petitioner's sentencing, slightly over one year post-<u>Booker</u>, the Court was well aware that the guideline findings were, pursuant to <u>Booker</u>, advisory and no longer mandatory, and that it was required to consider the factors set forth in Title 18 U.S.C., § 3553(a) in sentencing petitioner. (<u>Id</u>. at 31).

Petitioner's sentence does not violate <u>Booker</u>, as it is well within the statutory maximum. Furthermore, his enhancements for obstruction and for possession of a firearms in connection with another felony offense were entirely appropriate under the circumstances and the sentencing Court made specific individualized findings regarding them. (Dkt.# 94-1 at 5 - 6 and 14 - 15). The maximum term of imprisonment for petitioner's offense, as determined by the probation officer, was ten years. The Guideline range was 92 - 115 months. (PreSentence Investigation Report, Dkt.# 82 at 22). Even with the enhancements, petitioner's sentence was 92 months, the lowest end of the guideline range.

Not only has petitioner failed to rebut the presumption that his sentence is reasonable, but he has not even attempted to proffer any cause, external to himself, excusing his failure to raise this issue on direct appeal. Since he has not shown cause, he cannot prove prejudice. Accordingly, petitioner is procedurally barred from raising this claim.

**<u>Ground Two (a)</u> - Whether Trial Counsel's Performance was Ineffective for Failing to Obtain Independent Expert Testing of the Clothing, Weapons, Shell Casings and GSR results, in Order to Prove that Petitioner Did not Fire a Weapon or Wear Either Jacket Introduced at Trial as One of the Jackets in Which the Guns Were Found Wrapped.**

Petitioner contends that had counsel only requested expert DNA testing on the jackets found wrapped around the guns, as well as comparison testing of the GSR on his hands with that in the shell casings found at the scene of the shooting, then there would have been "irrefutable scientific

evidence to substantiate his innocence," because had there been scientific testing excluding him, the "tenuous" eyewitness testimony of the "two-person show-up" identifying him would have been discounted by the jury. (Dkt.# 103 at 12 - 13).

In Strickland v. Washington, 466 U.S. 668 (1984), the Supreme Court of the United States established a two-part test for determining whether a convicted person is entitled to relief on the ground that his counsel rendered ineffective assistance. The first prong of the test requires that the petitioner demonstrate that counsel's performance was deficient and "fell below an objective standard of reasonableness." Strickland at 688. The second prong requires the petitioner to show that the deficient performance prejudiced the defense. Id. at 687. In order to satisfy the prejudice requirement of the two-prong test set forth in Strickland, defendant must show that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Lockhart v. Fretwell, 506 U.S. 364 (1993).

A Court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonably professional assistance. Strickland 466 U.S. at 689-90. Moreover, there are no absolute rules in determining what is reasonable performance. See Hunt v. Nuth, 57 F.3d 1327, 1332 (4th Cir. 1995) (counsel's representation is viewed on the facts of a particular case and at the time of counsel's conduct).

Petitioner's contention that counsel failed to adequately defend him by subjecting the prosecution's case to a true adversarial test, obtaining independent expert testing of the clothing, weapons, shell casings and GSR results, in order to conclusively demonstrate that petitioner had not fired any weapon or worn either jacket introduced at trial fails. As stated *supra,* trial counsel was privy to the overwhelming eyewitness testimony and other evidence already available indicating that

petitioner was the shooter who had divested himself of the guns, wrapped in the jackets, as he made his getaway. As such, forgoing the extra step of obtaining more testing that would not help petitioner's case, and that might actually produce more evidence implicating him, a strategic decision which was not unreasonable under the circumstances. A strategic decision generally will not be second-guessed. <u>Wiggins v. Corcoran</u>, 288 F.2d 629, 640 (4th Circ. 2002).

Further, counsel did retain a forensic firearms expert who challenged the conclusions of the Government's forensic firearms expert regarding the testing of gunshot residue found on petitioner's hands. (Dkt.# 92-3 at 407 - 420). One of the Government's witnesses had already testified that he knew petitioner well and recognized him as the man who pointed the gun and shot at him that day. (Dkt.# 77-1 at 38-39). Another Government eyewitness, who lived at the corner of the alley where the shooting occurred, testified that she heard shots fired and looked out her window to see two men, one of them fitting the description of petitioner and the other, his cohort, running from the scene in the direction of the area in which petitioner and his cohort were later apprehended. (Dkt.# 77-1 at 6-10). That witness testified that one of the men running was wearing a dark colored jacket and the other was carrying one. (<u>Id</u>. at 7). Another witness testified that he heard shots fired nearby and was on the phone with 911 reporting it, when he saw petitioner running toward him in the alley wrapping a gun (Dkt.# 77-1 at 17 - 18 and 38 - 39) in a dark-colored jacket or sweatshirt (<u>Id</u>.) that matched the description of the gun and jacket that were later found a short distance away from where petitioner was apprehended. (Dkt.# 91-2 at 147, Dkt.# 92 at 267). The Government's ballistics expert had already confirmed that the gun that was fired at the scene of the shooting was the same gun (Dkt.# 92-2 at 352) that another witness testified was found, minutes after the shooting, along with a second gun, wrapped in two dark-colored jackets matching the description of those petitioner

and his cohort had been seen wearing or carrying, left in a shallow area in the ground behind the Central Catholic High School gymnasium (Dkt.# 91-2 at 146 - 152). The police tested petitioner and the two other men he was with that day for gunshot residue; of the three, only petitioner's hands tested positive for gunshot residue. (Dkt.# 92-1 at 284- 286). Petitioner and his cohort were apprehended within 5-6 minutes of the shooting (Dkt.# 91-2 at 123 and 168 - 171 and Dkt.# 91-3 at 177), walking a short distance from where the guns were found abandoned. (Dkt.# 91-2 at 144 - 148). The abandoned guns were found approximately 5-10 feet from the alley opening out onto the area on 12th Street where petitioner and his cohort were apprehended. (Dkt.# 91-2 at 123 and 147). The two jackets and the guns they were wrapped around were completely dry, despite a recent heavy rain in the area within the previous hour. (Dkt.# 91-2 at 156 - 157). When apprehended, petitioner and his cohort were soaked with perspiration and appeared to have been running, on a day that was not particularly hot (Dkt.# 91-2 at 174 and Dkt.# 91-3 at 195). They seemed agitated and reluctant to approach when directed to do so by the officer who took them into custody. (Dkt.# 91-2 at 173 - 174). When apprehended, they no longer had the jackets the eyewitnesses had seen them wearing or carrying only minutes earlier. (Dkt.# 91-2 at 171 - 172). There was testimony that the entire time from the initial "shots fired" call came in, until the petitioner was apprehended, was less than ten minutes. (Dkt. 91-3 at 177).

Counsel, through vigorous cross-exam of the government's witnesses and direct exam of the defense witnesses, attempted to persuade the jury that the shooter was someone other than petitioner. Petitioner, when he took the stand, denied any involvement in the shooting, claiming that he was only in the area that day because he was on a leisurely walk to obtain a haircut in the neighborhood,[21]

---

[21] The petitioner and his cohort were apprehended walking *away from*, not toward the location that they both testified that they were headed to, to get haircuts. (Dkt.# 91-2 at 176, Dkt.# 77-2 at 75, 83 and 111 - 112).

a description that did not coincide in any way with the description of the facts provided by other witnesses. There was ample credible evidence, including the testimony of three eyewitnesses, two of whom had no criminal background, that put petitioner at the scene of the shooting, firing the gun and then running away at high speed and that connected him to the firearms found behind the gym minutes later. Because the jury apparently was unpersuaded by petitioner's version of the events does not prove that his counsel was ineffective. This claim lacks merit and should be denied.

**Ground Two (b) - Whether Trial Counsel's Performance was Ineffective for Failing to Interview Witnesses and Visit the Crime Scene to Authenticate the Witness Statements and the Contents of the Crime Scene Within the Brady Material from the Government**.

Petitioner alleges that defense counsel "failed to interview witnesses and visit crime [sic] scene to authenticate the contents and statements within Brady material from the Government." He offers no further details on this claim, nor does he explain what presumably exculpatory material counsel could have extracted from the interviews. Petitioner's claims are unclearly stated. To the extent that petitioner is claiming that counsel performed an inadequate or improper investigation by failing to interview witnesses and visit the crime scene, the claims are insufficiently pled, lack merit and are unsupported by the record.

Trial counsel did visit the crime scene; he attended the jury view of the scene of the offense along with the petitioner, on the second day of trial. The two of them rode together in a van operated by U.S. Marshals. (Dkt.# 92-1 at 309 - 320). Further, at trial, defense counsel vigorously and effectively cross-examined each witness for the prosecution, challenging their testimony. He asked numerous detailed questions about the entire layout of the area of East Wheeling where the offense

occurred, revealing not merely adequate preparation, but a ready familiarity with the area.[22] Clearly counsel had visited the scene well before the jury view: his questions to witnesses indicated a thorough, particularized knowledge of the complex area of East Wheeling where the offense occurred: its marked streets; hills; intersections; back alleys; unmarked pathways; abandoned lots; wooded areas; foliage in the area offering cover; its local businesses; clubs; schools; churches; day care centers; and other facilities and landmarks. The questions counsel asked indicate that he was extremely conversant with the area, very well prepared and that he conducted a vigorous defense on behalf of petitioner.

As to petitioner's claims that defense counsel failed to interview witnesses, petitioner offers no evidence in support of this. Further, the record reveals that counsel did call two lay witnesses from petitioner's neighborhood to testify on his behalf, as well as a forensic scientist to rebut the Government's forensic witness' testimony regarding the gunshot residue. Counsel conducted a vigorous cross exam of each of the Government's witnesses as well as very able direct and re-direct exams of his own witnesses.

Petitioner has neither shown that counsel's performance fell below an objective standard of reasonableness, nor has he explained exactly how or in what way counsel's purported failure to visit the crime scene or counsel's alleged failure to authenticate witness statements prejudiced him, thus he has failed in his burden of proof under Strickland.

Habeas petitions must meet heightened pleading requirements. McFarland v. Scott, 512 U.S. 849, 856 (1994). "In order to obtain an evidentiary hearing on an ineffective assistance claim -- or,

---

[22] At one point during the cross examination of a police officer, defense counsel asked "Is 12th Street an area where people typically could run and hide because of the wooded area up there?" When the officer agreed that it was, counsel then said "Okay. And do you think that I am the only one who knows that?" Dkt.# 91-3 at 178.

for that matter, on any claim -- a habeas petitioner must come forward with some evidence that the claim might have merit. Unsupported, conclusory allegations do not entitle a habeas petitioner to an evidentiary hearing." Nickerson v. Lee, 971 F.2d 1125, 1136 (4th Cir. 1992), *cert. denied,* 507 U.S. 923 (1993), *abrogation on other grounds recognized,* Yeatts v. Angelone, 166 F.2d 255 (4th Cir. 1999).

Here, petitioner has come forward only with the barest of allegations, all of which are unsupported. He has not produced any evidence that his attorney performed an inadequate investigation by failing to interview witnesses or visit the crime scene. Nor is there any evidence in the record that to suggest that additional investigation by counsel would have produced anything to indicate that petitioner was not the one who committed the offense. Petitioner has neither shown that his attorney made any error at all, let alone that counsel made an error so serious that he failed to function as his counsel under the Sixth Amendment. He has not shown that he was prejudiced in any way by counsel's alleged failures. Because these claims are unsupported by the record and lack any factual support, they should be denied.

**Ground Two (c)(1) and (c)(4) - Whether Trial Counsel was Ineffective for Failing to Object to and Preserve as an Issue for Appeal the Due Process Violation that Occurred when the Prosecution Intentionally Withheld and the Police Intentionally Failed to Request Certain Scientific Testing Which Would Have Proved that Petitioner Did Not Possess the Smith & Wesson Pistol.**

Petitioner alleges that "the prosecution intentionally withheld scientific tests which would have conclusively demonstrate [sic] that Petitioner did not possess the Smith & Wesson pistol," (Dkt.# 103 at 6): 1) DNA testing on the jackets wrapped around the discarded guns; 2) fiber tests on the jackets; 3) GSR testing on the jackets; and 4) comparison testing of the GSR found on petitioner's hands with that found in the expended shell casings. Petitioner further contends that not

only did the prosecution refuse to request such tests, but they also "concealed results of those tests from petitioner." Petitioner alleges that counsel was ineffective for failing to object to and preserve for appeal all of these issues.

Petitioner's presumption that counsel's performance was ineffective because he failed to object to the prosecutorial misconduct that petitioner alleges occurred is based on faulty presumptions and conclusory allegations. Petitioner cites no authority to support his contention that a prosecutor has any duty or obligation to conduct whatever additional scientific testing a defendant wishes to have performed. To the contrary, the settled law states otherwise: the Due Process Clause is not violated when the police fail to use a particular investigatory tool; the police do not have a constitutional duty to perform any particular tests. Arizona v. Youngblood, 488 U.S. 51, 58 - 59, 109 S. Ct. 333; 102 L. Ed. 2d 281 (1988). These claims are nothing more than vague conclusory allegations; petitioner has presented no evidence or specific allegation to show that the prosecution either performed a particular test and then concealed the results, or that the prosecution intentionally withheld anything. Since no prosecutorial misconduct occurred, there was no due process violation. Therefore, trial counsel's performance can not be found deficient for failing to object when there was no basis to do so and where objection would be futile. Since petitioner can prove neither deficient performance or prejudice, he has failed in his burden under Strickland and this claim should be denied.

**Ground Two (c)(2) - Whether Trial Counsel's Performance was Ineffective for Failing to Object to and Preserve as an Issue for Appeal the Due Process Violation that Occurred when the Prosecution Entered both Firearms into Evidence, when Petitioner was Only Charged with Possessing One of Them**.

Petitioner claims that trial counsel was ineffective for permitting the .45 caliber Sig Sauer to be entered into evidence "without objection by Petitioner's counsel." This claim is unsupported

by the record, which shows that counsel's objection to the admission of this weapon, and the

Government's and Court's responses spanned three pages of trial transcript:

*(Direct Exam Testimony by Government Witness, Wheeling Police Officer David Gittings):*

Q. What caliber is that gun?

A. It is a .45 caliber.

Q. All right.

Mr. PERRI: The United States would move for the admission of Exhibits Number 1 and 3.

THE COURT: Any objection?

MR. WALKER: No objection to the 9 millimeter, your Honor. As to the second firearm, I object. It is irrelevant and I also think it is not admissible under Rule 403.

MR. PERRI: May we approach your Honor?

. . .

MR. WALKER: I am having an objection to the government referencing there was a second firearm, as long as they don't make it a part of the case, but I don't see any relevance of the admission of the second firearm. It wasn't charged in the indictment. I don't think Mr. Banks was even alleged to have possessed that particular firearm in this case. It is - - I think the jury may draw unfair inferences from the admission of the second firearm, the more firearms, the more serious the case. Perhaps, they may be swayed by that, prejudiced against Mr. Banks. It is totally unnecessary. It has no probative value whatsoever.

Trial Transcript, Dkt.# 91-2 at 152 -53.

The Court overruled defense counsel's objection and admitted the .45 into evidence with a

cautionary instruction to the jury, to make it clear to them that the .45 was not the gun the petitioner

was charged with possessing in the indictment. Even then, defense counsel continued to voice

vigorous objection to its admission:

MR. WALKER: And just so the record is clear, Judge, I respect the court's ruling. I understand where Mr. Perri is coming from. He has a right to tell his story subject to certain exceptions, but why do we need the physical evidence? Why does the handgun that is commercially available, why does

it have to go back to the jury?  What purpose does that serve?  They get to tell their story.  The government gets to explain their case.  I didn't object.  I didn't file a motion in limine.  Why does that big gun have to go back to the jury?  It just doesn't make sense to me, Judge.  It is in the long run - - will serve to prejudice Mr. Banks.

Id. at 154.

Further, since this claim *was raised* on appeal and was duly rejected by the Fourth Circuit, counsel can hardly be accused of being ineffective for not raising it.  This claim clearly lacks merit and should be dismissed.

**Ground Two (c)(3) - Whether Trial Counsel's Performance was Ineffective for Failing to Object to and Preserve as an Issue for Appeal the Due Process Violation that Occurred When the Police Subjected Petitioner to an Overly-Suggestive Two-Person Witness Identification Line-Up.**

This claim has already been addressed *supra;* again, petitioner's claims are completely unsupported by the record.  The line-up was a three-person, not a two-person line-up.  Further, before trial, counsel filed a motion to exclude identification evidence, objecting to the witness identification line-up.  (Dkt.# 22).  The issue was litigated at a pre-trial motion suppression hearing before the Magistrate Judge on September 12, 2005 (Dkt.# 36) and the line-up was determined to be fair and not overly-suggestive pursuant to the tests set forth in U.S. v. Wade, 388 U.S. 218 (1967) and U.S. v. Johnson, 114 F.3d 435, 441 (4th Cir.), *cert. denied*, 552 U.S. 903 (1997).  Further, after the  Magistrate Judge's Report and Recommendations was issued (Dkt.# 43), trial counsel did file objections.  (Dkt.# 44).   The motion to exclude identification evidence was discussed  again at the pretrial conference by the District Judge on October 31, 2005 (Dkt.# 66), one day before trial, and the Court ultimately ruled against petitioner.   (Dkt.# 76).  Since the witness identification line-up was determined to be fair and not overly-suggestive, no due process violation occurred.   Merely because the Court ruled against petitioner on this issue does not prove that  counsel was ineffective.

Petitioner's claim that counsel was ineffective for failing to object to it is easily belied by a cursory review of the record.   Since petitioner's claim lacks merit, he cannot prove cause and certainly cannot prove prejudice.   This claim should also be denied.

**Ground Two (c)(5 - Whether Trial Counsel's Performance was Ineffective for Failing to Object to and Preserve as an Issue for Appeal the Due Process Violation that Occurred When the Prosecution Varied the Jury Instruction From its Theory of the Offense by Submitting a "Constructive Possession" Charge Instead of an "Actual Possession" Charge.**

Petitioner's contention is, in effect, an allegation that the prosecution varied its firearm possession charge in the indictment to a "constructive" versus an "actual" possession charge, thus preventing his counsel from being able to mount an adequate defense on his behalf, and that counsel failed to object.   Counsel "failed to object" to this "issue" because it is a non-issue.   The indictment merely charges petitioner with "knowingly possess[ing]" a firearm, after previously having been convicted of a felony.   The jury charge was commensurate with possession in both its forms implicated by the facts of the case: actual, where petitioner was identified at the scene as the shooter and then running away, wrapping the gun in a jacket, and constructive, after he had abandoned the then-wrapped weapon behind the school gymnasium.   Counsel's performance on this issue was not deficient, and therefore there was no prejudice.   This claim lacks merit and should be denied.

**Ground Two (c)(6) - Whether Trial Counsel's Performance was Ineffective for Failing to Object to and Preserve as Issues for Appeal the Due Process Violation that Occurred When at Sentencing, Petitioner Was Given a Two-Level Upward Departure Under § 3C1.1 for Obstruction, and an Increase in Base Offense level, Pursuant to § 2K2.1(b)(5) [sic], "in Violation of Booker-3/ and Crawford-4/."**

Petitioner's claim that at sentencing, counsel failed to object to the two sentencing enhancements  is likewise unsupported by the record.   The record clearly shows otherwise:

THE COURT: All right.  The other objections are, first, the defendant objects to the two-level enhancement for obstructing justice under advisory Guideline 3C1.  Mr. Walker, do you want to speak to that objection?

MR. WALKER: Yes, your Honor. . . The bottom line is that we believe that Mr. Banks told the truth at trial and we respectfully disagree with the jury's verdict. And we believe that Mr. Banks' version of the events was accurate, that it was truthful, that it was complete, and that he simply didn't perjure himself. It is the same version of events that was told at trial, that Mr. Banks told me again today, that he will likely communicate to the Court when he allocutes. And it happens to be the same - - the essence of it is the same that Mr. Banks told me the first time that I met him. He keeps telling me the same story, over and over again. He maintains his innocence and the jury made a finding to the contrary, but that doesn't necessarily - - it doesn't necessarily follow that he, therefore, perjured himself. The jury didn't make a finding on obstruction of justice. The jury wasn't asked to make a finding on obstruction of justice, and I don't think it is fair to conclude from the jury's verdict that Mr. Banks necessarily lied, nor does the Court have to conclude that. We understand it is within the Court's discretion to make that finding. We are only urging the Court to consider our position and to consider the fact that we believe this was truthful testimony before it rules an obstruction of justice.

Sentencing Transcript, Dkt.# 94-1 at 5.

Despite counsel's argument, the Court overruled the objection, finding that petitioner's

testimony regarding his version of the event was

at odds with testimony of various witnesses that placed him at places that were diametrically opposed to where he said he was and the route he took. . . . I think that the defendant did testify, first, did testify falsely. He testified as to a material fact. And that he also testified falsely as to a material fact willfully in order to obstruct justice and not merely inaccurately as a result of confusion or faulty memory, as that test has been set forth by United States versus Dunnigan[.]

Id. at 6.

Further, counsel also *vigorously* objected to the four-level enhancement under Guideline

2K2.1(b)(6) for possession of a firearm in connection with another felony offense, wanton

endangerment:

MR. WALKER: Yes, thank you, your Honor. . . The Court heard testimony and now the Court has the opportunity to make judgments about it. The Court doesn't have to agree with what the government or what anybody else presumes the jury made a finding of. We are not asking the Judge to contradict . . . the jury. We are asking for a simple, independent determination of the facts. I will start out by saying something

I probably should have emphasized before I began talking about my first objection. This case was a case about eyewitness testimony. That was the essence of it. I am not trying to sweep the forensic evidence under the rug here because there was testimony about gunshot residue. I don't think that testimony was very compelling. I certainly don't think that in and of itself, that the gunshot residue in this case is something that the jury could have relied upon without additional testimony, so it comes down to eyewitness testimony . . . we all know this, and it is widely understood that eyewitness testimony is not necessarily reliable . . . it is fallible . . .across the country for decades people have been wrongfully convicted based upon eyewitness testimony . . . that is something that we all understand as lawyers and as judges, but it has been proved over time with the DNA test . . . they recognize now [that] people are wrongfully convicted and that is the prism through which I am analyzing this case. I know it was a large part of our defense at trial . . As it relates to this enhancement, we are going to place four levels according to the presentence investigation report, based on the testimony of James Harris. That is how we find a basis under the analysis of the presentence report for the four-level enhancement for wanton endangerment. Now, the jury didn't make a finding on whether wanton endangerment occurred . . . In fact, the wanton endangerment charges as far as I know have been dismissed in state court. The jury didn't have to conclude that James Harris was telling the truth and that there was a shooting or there wasn't wanton endangerment or attempted murder, whatever you want to call it, in order to come back with the jury verdict. Because the jury had testimony of Mr. Stewart and I maintained at trial and respectfully maintain today, he is a well-intentioned person. I think he is mistaken, and I think that given what we know about eyewitness testimony, we can barely believe or accept the responsibility that he is mistaken, and we are left with his testimony and the gunshot residue . . . that man, Mr. Harris . . . is a liar . . . he meets the definition of someone who is a liar . . . by his own admission, he was untruthful to the state court judge in the state preliminary hearing that preceded this federal matter. He was untruthful to ATF. He was - - and this was not to an insignificant matter. He was untruthful as to who was involved, who was there, who was a witness . . . if you are untruthful about a material fact, that the entire credibility of your testimony can be called into question . . . we believe that he was being completely untruthful . . .he admitted he walked into this building with the intention of misleading or withholding the whole truth from the federal investigative grand jury . . . he is . . . a four-time felon . . . a drug dealer, has been convicted for dealing drugs. . . He doesn't have a 9:00 to 5:00 job . . . drives around in a fancy car . . . has associates who are believed or known to be actively engaged in drug activity . . . He has been recently involved in a shooting . . . has shot people before and the bottom line is the Court knows this is not the kind of person we rely upon. . . And I am asking the Court to simply exercise what I believe is common sense and fair judgment and reject the testimony of Mr. Harris. I am not asking the Court to reverse the conviction . . . to throw out all of the evidence . . . but I am asking this Court to make . . . a specific finding that Mr. Harris is not credible . . . I am asking the Court to rule in our favor that there was not substantial evidence to support an enhancement

for wanton endangerment . . . I think that based on my experience . . . that this Court must have . . . a serious doubt about the reliability of Mr. Harris . . . all we have to go on is Harris' word . . . my point is there are so many alternatives . . . so many possible explanations other than the government's theory and what was set forth in the presentence investigation report as to what happened in the alley. We don't know there was a wanton endangerment . . . We can't rely on Mr. Harris' testimony . . . we shouldn't speculate as to what actually occurred in the alleyway. This finding should not be adopted by the Court.

Id. at 6 - 13.

Despite defense counsel's strenuous arguments, the Court still overruled the objection, noting that a third witness, Toni Reynolds, also provided credible testimony corroborating the number of shots fired, and the presence of two black males at the scene, each one either wearing or carrying one of the jackets later found wrapped around the weapons at a different location. The Court ruled that this witness' corroboration of the facts testified to by the other two witnesses, Harris and Stewart, provided "back-up testimony" and that the four-level enhancement was appropriate.

The imposed sentence enhancements are a direct result of petitioner's decision to go to trial and deny his involvement in the offense. At trial, witnesses testified that petitioner was the one who fired the weapon, that petitioner fled the scene and was joined by another black male. Another witness testified that petitioner was seen running through the streets of East Wheeling wrapping the gun in a jacket he had been seen wearing. Still other witnesses testified that the jacket, along with a jacket his cohort was wearing, was found, minutes later, wrapped around the gun that had been fired and another weapon, approximately ten feet away from the area where petitioner was apprehended. Further, the jackets were dry to the touch, in an area that had undergone a heavy rain within the hour, indicating that they had only recently been placed there. When taken into custody, petitioner and his cohort appeared nervous, agitated and reluctant to approach the police; they were soaked with perspiration as if they had been running, on a day that was cool enough to wear a jacket.

At trial, petitioner took the stand and testified that he was headed to one location to get a haircut (Dkt.# 77-2 at 111), but he was apprehended walking in the opposite direction needed to arrive at that location. (Dkt.# 91-2 at 176). He denied all of the aforementioned testimony and his involvement in the offense, testimony clearly at odds with the overwhelming direct and circumstantial evidence presented by other witnesses.

The fact that the jury found the petitioner guilty despite this defense does not establish that defense counsel was ineffective. It merely shows that the jury did not believe petitioner was telling the truth. Petitioner alone subjected himself to the possibility of enhanced sentencing by being in possession of a firearm when he had not had his civil right to do so restored; by committing another felony offense using a firearm; and by insisting on taking the stand and testifying falsely about it all at trial. The decision to go to trial was petitioner's; counsel is not responsible for the sentencing enhancements that were founded on extensive and damaging trial testimony.

This claim lacks merit; petitioner can neither prove counsel's performance was deficient or that he was prejudiced by anything counsel did or did not do; relief should be denied.

Finally, petitioner raises a "catch-all" ineffective assistance of counsel claim, alleging that counsel was ineffective for failing to object to or preserve unspecified "intrinsic/implicit issues within" his "discussion" (memorandum in support of his § 2255 petition) for appellate review. Petitioner has not provide the court with any specific examples of counsel's failures in this regard and therefore his claims are insufficiently pled under Fed. R. Civ. Pro. 8. Furthermore, these claims are so vague and conclusory and such, they fail to establish that petitioner is entitled to relief under the preponderance of the evidence standard. Accordingly, they should be denied.

**<u>Ground Three</u>: Whether Appellate Counsel's Performance was Ineffective for Failing to Appeal the Due Process Violations that Petitioner Claims *Supra*.**

Petitioner's § 2255 motion also implicitly claims that appellate counsel was ineffective for not raising as issues for appeal all of the due process violations he claims:

1) the prosecution's "intentional withholding" of scientific testing which would have "conclusively proved" that petitioner did not possess the Smith & Wesson pistol;

2) the prosecution's entering of both firearms into evidence, when petitioner was only charged with possessing one of them;

3) the overly-suggestive two-person witness identification line-up the police subjected petitioner to;

4) the "intentional failure" of the police to request certain tests that would have exonerated petitioner as having been in possession of the Smith & Wesson pistol: fiber and DNA testing on the jackets found wrapped around the discarded firearms; a primer test to compare the composition of GSR on petitioner's hands with that in the expended shell casings; and fingerprint analysis of the Smith & Wesson pistol;

5) the prosecution's varying the jury instruction from its original theory of the offense by submitting a "constructive possession" charge instead of a "actual possession" charge; and

6) the two-level upward departure in sentencing petitioner received, pursuant to § 3C1.1 for obstruction, and the increase in base offense level, pursuant to § 2K2.1(b)(5) [sic] petitioner received "in violation of Booker-3/ and Crawford-4/."

The standard of effective assistance of appellate counsel is the same as for trial counsel. See Bell v. Jarvis, 236 F.3d 149, 164 (4th Cir. 2000) ("In order to establish a claim that appellate counsel was ineffective for failing to pursue a claim on direct appeal, the applicant must normally demonstrate (1) that his counsel's performance fell below an objective standard of reasonableness

in light of the prevailing norms, and (2) that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.") (internal citations and quotations omitted).  On review, however, appellate counsel is accorded the "presumption that he decided which issues were most likely to afford relief on appeal." Pruett v. Thompson, 996 F.2d 1560, 1568 (4th Cir. 1993).

Moreover, "[c]ounsel is not obligated to assert all nonfrivolous issues on appeal." Bell v. Jarvis, 236 F.3d at 164.  Instead, "[t]here can hardly be any question about the importance of having the appellate advocate examine the record with a view to selecting the most promising issues for review." Jones v. Barnes, 463 U.S. 745, 752 (1983); see also Smith v. South Carolina, 882 F.2d 895, 899 (4th Cir. 1989).  "Indeed, winnowing out weaker arguments on appeal and focusing on those more likely to prevail, far from being evidence of incompetence, is the landmark of effective advocacy." Bell v. Jarvis, 236 F.3d at 164 (quoting Smith v. Murray, 477 U.S. 527, 536 (1986) (internal quotations omitted).  However, although it is "still possible to bring a Strickland claim based on counsel's failure to raise a particular claim" on direct appeal, demonstrating that counsel was incompetent for failing to do so will be difficult. Smith v. Robbins, 528 U.S. 259, 288 (2000). "Generally only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome." Gray v. Greer, 800 F.2d 644, 646 (7th Cir. 1986).

Petitioner's claim that his appellate counsel was ineffective for not raising the issue of the prosecution's entering of both firearms into evidence, when petitioner was only charged with possessing one of them lacks merit; contrary to petitioner's claims, and as already addressed *supra,* counsel did object vigorously to this issue at trial.  Further, appellate counsel also raised the issue on appeal where it was rejected by the Fourth Circuit.  To the extent that petitioner is attempting to

re-argue the same issue, it is procedurally defaulted and should be denied.

As for the "overly-suggestive two-person witness identification line-up" the police subjected petitioner to, this claim has already been addressed *supra* as well. Clearly, here, appellate counsel examined the record with a view to selecting the most promising issues for review. Jones v. Barnes, 463 U.S. 745, 752 (1983); see also Smith v. South Carolina, 882 F.2d 895, 899 (4th Cir. 1989). Since this issue lacked merit, had already been litigated and rejected, it is not surprising that appellate counsel did not choose it as an issue for appeal. Generally only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome." Gray v. Greer, 800 F.2d 644, 646 (7th Cir. 1986).

The prosecution's and the police's "intentional withholding" of scientific testing which would have "conclusively proved" that petitioner did not possess the Smith & Wesson pistol, again, has already been addressed, *supra*. The prosecution, including law enforcement, has no duty to perform any particular testing, no prosecutorial misconduct occurred and petitioner's due process rights were not violated. It is not surprising that appellate counsel did not choose this issue for appeal since it is completely without merit. This claim should be denied.

Likewise, petitioner's contention that appellate counsel was ineffective for failing to appeal his "due process violations" that occurred as a result of the prosecution's varying the jury instruction by submitting a "constructive" vs. "actual possession" charge; and the § 3C1.1 and § 2K2.1(b)(6) sentencing enhancements petitioner received (for obstruction and wanton endangerment, respectively), are likewise so completely lacking in merit that appellate counsel's decision not to choose them for appeal was not surprising and completely appropriate. It is appellate counsel's job to winnow out weaker arguments in favor of arguments which are more promising. This is not a

situation where an ignored issue is clearly stronger than those presented for appellate review, sufficient to over come the presumption of effective assistance of appellate counsel. These claims should be denied.

## IV.   Recommendation

For the reasons stated above, the undersigned recommends that the petitioner's §2255 motion be **DENIED and DISMISSED with prejudice** from the docket.

Therefore, the following motions should all be **DENIED** as moot:

**A**.      Petitioner's March 6, 2008 *pro se* Motion to Appoint Expert Witnesses (Dkt.# 101);

**B**.      Petitioner's March 6, 2008 *pro se* Motion for Protective Order (Dkt.# 102);

**C**.      Petitioner's August 10, 2009 *pro se* Letter Motion to Attend Funeral (Dkt.# 109);

**D**.      Petitioner's November 13, 2009 *pro se* Motion to Preserve all Exhibits & Evidence Pending Disposition of Defendant's Motion to Set Aside Conviction and Sentence Pursuant to 28 U.S.C. § 2255 (Dkt.# 117); and

**E**.      Petitioner's requests for: an evidentiary hearing; an Order directing the Government to preserve all evidence for further testing; an Order directing the Government to secure independent testing of the evidence mentioned *supra;* his conviction to be vacated and a new trial ordered; and for counsel to be appointed on his behalf.

Within **fourteen (14) days** after being served with a copy of this report and recommendation, any party may file with the Clerk of Court written objections identifying those portions of the recommendation to which objection is made and the basis for such objections. A copy of any objections shall also be submitted to the United States District Judge. Failure to timely file objections to this recommendation will result in waiver of the right to appeal from a judgment of this

Court based upon such recommendation. 28 U.S.C. § 636(b)(1); <u>Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>Wright v. Collins</u>, 766 F.2d 841 (4th Cir. 1985): <u>United States v. Schronce</u>, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984).

The Clerk is directed to mail a copy of this Report and Recommendation to the *pro se* petitioner by certified mail, return receipt requested, to his last known address on the docket sheet, and to counsel of record, as applicable.

DATED: July 20 , 2010

*John S. Kaull*

**JOHN S. KAULL**
**UNITED STATES MAGISTRATE JUDGE**